Ms. Barbee? Good morning. May it please the Court. My name is Attorney Daphne Barbee. I represent Palasi, Sam Paletasi, who was actually present here to observe the argument today. As the Court is aware, this is a disability discrimination case against the federal agency ICE, Immigration and Customs Enforcement. Mr. Paletasi had been hired as a criminal investigator and had worked for 18 years as a criminal investigator for Immigration Services, which subsequently, in 2004, became Immigration and Customs Enforcement. So the agency had a changeover with the new administration. Unfortunately, in 2001, Mr. Paletasi contracted the disease of Guillain-Barre, which causes partial paralysis. In some businesses, it causes death. With respect to Mr. Paletasi's condition, in 2001, he was completely paralyzed on a ventilator at a hospital. However, fortunately, he was able to retain some ability to move through rehabilitation and physical therapy. In the year 2002, March 2002, he was able to return to work, first in a wheelchair, as a criminal investigator part-time. Then, two months later, he was able to return full-time and was able to regain his strength such that he is able to walk and no longer use the wheelchair, but he did have a brace on his leg. It is undisputed that he was disabled. He could not run or jump, and the government has never claimed that he was not disabled or substantially limited in his physical conditions. In the year 2004, May 2004, from 2002 until 2004, Mr. Paletasi worked as a criminal investigator. He was evaluated by his supervisor and was evaluated at the very good category, which is the highest category of work evaluation that a criminal investigator could receive. So he was doing his work. He primarily was able to compensate because his previous manager allowed him to not use a firearm. This doctor said his grip was not strong enough, although he was making recoveries. His grip was not strong enough to use a firearm. So his previous manager allowed him to do a lot more administrative work, such as writing reports, doing affidavits for search warrants, and he was still able to do removal notices to people. He traveled inter-island with other agents and was able to do his work inter-island. But in 2004, when custom enforcement managers, Ms. Mardell Tomashiro and Mr. Bratt were transferred as his managers, they cut back on his work and said he could no longer do inter-island traveling. They said he could no longer go to the prison to serve removal notices upon people, and he filed an EEO complaint about that. Then, after he filed his EEO complaint, the managers said that he would not be able to get this promotion. Now the promotion was a step increase to GS-13. All of the other agents got the promotion except for Mr. Pulitasi, and the only criteria for this promotion was that you have one year of service, good service, and have a good evaluation. So he fit the criteria of the promotion. He asked his supervisor why he didn't get the promotion, and the response was, well, pending your medical condition. And again, he added to his EEO complaint about that. After he filed the formal EEO complaint in July 2004 and submitted his medical documentation showing from his doctor, Dr. Fruin, saying that he is able to do 100% of the job. It's just the physical activities bear with him. He's still improving, especially the grip of the firearm. Dr. Fruin stated that Mr. Pulitasi would be able, in approximately six months, be able to improve his grip such that he would be able to use the firearm. After this, the management sent him, specifically Mr. Bratt, his immediate supervisor, who had only been a supervisor for one month in May 2004, sent him a notice saying that he should take a position which is called the Immigration Information Officer with a different agency. So it would no longer be within the ICE agency, but it would be with Immigration and the IIO position was a position which basically was a clerk who answers questions from the public about immigration and about citizenship. And at this different agency, Mr. Pulitasi called the head of the agency, which is Dave Gulak, and probably mispronouncing his name, and asked him was this IIO position available and was told it was not available. He subsequently emailed Mr. Bratt and told him he found out the position was not available and also asked if he could, asked about what's called safe pay, which is retained pay, meaning that if they insisted that he take this lower position and a lower rate of pay, which is essentially a demotion, that he could keep the same rate of pay that he was making as an immigration ICE criminal investigator. Do you have any authority that indicates that reasonable accommodation includes the same pay? Yes, I do. What would that be? All right. Well, first of all, if you look at the EEOC policy guidelines, which the court gives deference to, and section 915 of that specifically, and I believe I've attached it in my briefs, it says that when you're considering reasonable accommodations, one of the first things you should do is, of course, see if you can keep the job with a reasonable accommodation, job restructuring and things of that sort. And if you can't do the job restructuring and consider keeping the person in the same position, if you must transfer them to a different position, it should be at the same rate of pay or comparable pay. And if I could find the actual quote, bear with me. Also, I did cite the case of Norville versus Stanton. Who? I'm sorry. I just didn't hear you. I'm sorry. Norville versus Stanton Island University Hospital. It's a Second Circuit case, but the reason I cited it is it's very good language about transferring persons, and it says a reasonable accommodation for a disabled person does not mean a job at a lower rate of pay. It basically says that that should not be considered as a reasonable accommodation. But getting back to your question, Your Honor, I have cited several statutes. One is actually the regulations, the EEOC regulations. Twenty-nine CFR sections. I had a little trouble finding the stuff that you cited, and that's why I wasn't I'm sorry. I'm sorry. The EEOC guidance 915.002, and I believe I may have actually cited the quote from it. But in addition to that, the case law says that if it's a reasonable accommodation and you're going to transfer someone, it should not be at a lower rate of pay and a lower job position. And that is the Norville case that I cited to you. Thank you. And the EEOC policy guidelines. Also, in the record, I also attached copies of documents of the policy on reasonable accommodation, which says you should find a job comparable pay, comparable position. Isn't the central question here whether Mr. Politasi is a qualified individual with a disability? And I guess I'm having trouble understanding why he meets that criteria, given the need for the special agents to have the ability to walk, run, jump, and do arrest preparedness. What makes him, even with the same pay, why can he do the essential functions of the job? All right. Because the essential functions of the job is primarily administrative. This is not a police officer job. This is not a security guard job. This is not a guard in a prison type job, which requires a lot of physical agility.  Primarily, it's an investigation. What that entails is someone who writes reports, works with the U.S. attorneys on various criminal aspects of cases regarding individuals who violate the immigration laws. It does not require the same amount of physicality as, say, a police officer or a prison guard. And that also, what is an essential function of the special agent is a question of fact, not a question of law. And in this particular instance, we have Mr. Puertasi, who, after he was disabled in 2002, is able to perform the job at the highest level. He was rated very good in 2003. So he is disabled. He's still working. He's still functional. And he's rated at the highest level, so he is qualified to do the job. But the issue really is the court usurped that function of finding the fact and made a decision that being very young and agile and physical is a requirement, a qualification to be a criminal investigation for ICE. And that's not in the job description. Also, even if it were in the job description, that's still a question of the fact for the jury to decide whether or not this is an essential function. Now, we've deposed other agents who said— Now, where do you get the authority for the statement that it's a jury function to decide what are the essential qualities? Yes, Your Honor, I would—it's from case law. And I specifically would quote Williams v. Philadelphia Housing Authority. It's at 380F3751. Is that in your brief? Yes, it is, Your Honor. It's in my opening brief as opposed to the reply brief. But basically, that was a similar case where the judge ruled that the person was not qualified. And the court said—the appellate court said, no, this is a function, a question of fact, not a question of law, but a question of fact. And so we would ask, Your Honor, to take a look at the Williams case. Is there a Ninth Circuit? That's a Third Circuit case. That is a Third Circuit, Your Honor. Is there a Ninth Circuit case? I cited a lot of Ninth Circuit cases, but I don't know whether I cited one exactly on point to that issue of question of fact as to qualifications. So I'd have to say I can't tell you exactly off the top of my head since I've quoted a lot of cases. However, I do know the Williams case does specifically state it's a question of fact, not a question of law. You know, let's assume that it is a question of fact. Here, the evidence did show that the written job description required the ability, I believe, to run and jump and carry a firearm. Certainly, carrying a firearm is, without question, something that Mr. Pulitasi could not do. The evidence showing the judgment of his employer about what the job required was to the same effect. There was evidence that there were only 27 others in the small office to do the job, so it wasn't as if there were lots of other people available to do different parts of the job. So, the only thing I can see that would raise an issue of fact, if it is an issue of fact, is that neither he nor some other agents had ever had to use a firearm. Correct. But the fact that you have never had to doesn't show that you shouldn't be able to when you do have to. Right. I understand what the court is saying. The question of fact is also his doctor wrote a note saying that he is improving. So, as a reasonable accommodation, couldn't they have waited six months? What is your view of the length of time during which an interactive process or the period of accommodation, as it were, has to go on? Because here they held his job open for a year. They created, in effect, a new billet, which assumed lesser qualifications. That is, it didn't require use of a firearm. It didn't require running or jumping. That he held for, what, over six months? Right. So, how much more do you say is required in order to satisfy whatever obligation you believe they still had? Well, with regards to that specific instance, certainly if it is unforeseen, he will never improve and it is permanent. I could see them saying, well, now we are going to look at reassignment as opposed to job restructuring. However, in this instance, his doctor wrote to them, Dr. Flynn specifically wrote to them and said his grip is improving and all the defendants who were deposed admitted that he had improved from 2002 up in 2004. So, it isn't a situation where he can never, ever improve such to use a firearm. In that instance, when you have a physician specifically telling employers who are not physicians and who have not sought a medical opinion, an independent medical opinion, that in that instance you would defer to the medical opinion because the doctor is the one who knows the disease. Well, I mean, it is extremely fortunate that he was improving. Yes. But my question is somewhat different and that is to what extent in your view and based upon the law which you could let us know about, do you say that there is an obligation to hang in there so long as someone is progressing? All right. I have to defer to the EEOC policy which says it is a case-by-case basis. If you want my view, I will tell you my view and my view is at least two years, at least two to three years. Why is that not just, you know, together in a year? What do you base that on? Okay. Because I am no doctor, mind you, but I do think there has to be some deference to a medical opinion upon a person's physical condition. And if the physician says this person will improve and they estimate a certain date and it is not too far off. Now, six months, considering that Mr. Politasi is doing his job, he is not sitting around or creating a ruckus. There are no complaints by other agents. He is pulling his weight. What harm is it to wait six more months, for an employer to wait six more months, especially if there is a fact that the Rehabilitation Act requires federal employers to affirmatively take affirmative steps to treat disabled employees? I am running out of time. Let me ask you, you made quite a point of the fact that nobody had ever had to, anybody in this work group, had had to use a firearm or do some of these more strenuous activities of prisoner chasing and so on. Right. But isn't it true that, say in the firefighting department, fireman's department, there are hundreds of firemen who have never had to climb down a ladder from a burning building carrying a 200 pound victim of smoke inhalation down a ladder. But they have to be able to do it. Now, what's the difference between this man and these firefighters that have these same kinds of requirements? There's a big difference. Firefighters, I will concede, that to me is an essential function of the job. But they've never had to do any of those things. And nobody in their company has ever had to carry anybody down out of a burning building. But aren't they able, isn't the fire department entitled to require that ability? It's the nature of the job, the firefighter, the nature of the job. And if you read my reply brief, I have cited two various other jobs which I think are more similar to the criminal investigator position than a firefighter position or a police officer position. Now, page three of my reply brief cites, for example, the police, the Capitol Police in our nation's capital. They are not, the law has specifically said in various cases that they are not to be considered law enforcement officers such that they have to have the sort of physical ability that you were questioning me about with regards to the immigration and custom enforcement criminal investigator. For example, IMS adjudication officers, the Villa Royale versus Department of Justice. Even when a job is considered a police officer job, Watson versus Department of Navy says no, that is not considered a law enforcement officer requiring the type of physical agility that is being placed upon the job with Mr. Politasi. And I'm sorry, I would just cite you to page three, Your Honor, of my reply brief, which cites a number of cases. And I did want to just say that reasonable accommodation requires a two-way street, and Mr. Politasi did respond. He asked about retained pay. He didn't get a response. He asked about other jobs. He actually, being a very good investigator, went in and investigated and found five other job positions, gave them to the employer, the employer didn't respond. He hired an attorney, the attorney wrote and asked for interactive processing. There was no response. I'm sorry.  Thank you, Ms. Barbee. Mr. Halperin, you're doing double duty this week. Triple duty. Triple duty. I'm always last, though. Your Honor, let me address the reasonable accommodation in the criminal investigator position first. Most of the court's questions had to do with that. Here we have Ms. Barbee proposed a three-year standard. Well, we met that standard. The chronology was he went out sick January of 2001. He came back. They held his job open for over a year until he came back, I think, in March of 2002. And then they kept him in essentially a light duty position all the way until April of 2004. So that's almost three and a half years after the initial going out sick. So even by Ms. Barbee's, I think, picked out of the air standard, we've met that. And then an important question of fact here, an important issue of fact, in the assertion by counsel that Dr. Froyen said that he would be able to use a firearm in six months. This is a reference to a letter in October of 2004. Dr. Froyen actually said that Mr. Pulitasi would be reassessed in another six months, didn't make any commitment as to what the reassessment would show. And that's at page 69 of the excerpts of record. More importantly, there's been a tendency, I think, by plaintiffs to try to focus in only on the firearms issue. Management clearly viewed the essential function as much more broadly than that, as the ability to interact with dangerous suspects. And it was undisputed in the record that just in a three-month period, the summer of 2004, there were over 100 instances where ICE investigators had to interact with dangerous suspects. Sometimes, or almost always, multiple agents, whether it's searches or arrests or interviews. So that was undisputed in the record that that was required of these folks. And I think Judge Goodwin's analogy to the firefighters is well taken. That's actually found at the EEO regulations, even though you may not actually have ever had to use a firearm, as many law enforcement officers. It's true for many law enforcement officers. May I ask you to tell me your view about what is required by the reassignment and interactive process? Yes. We have some cases that say even if the individual is not qualified for the essential functions of his current job, there's still a responsibility on the employer. Can you go through that for me? I think you've stated it a lot accurately. I think we were obligated to try to reassign him. And I think that we, the agency, more than met that responsibility. There was an extensive attempt on the agency's part to reassign Mr. Pulitasi. It started in May when they asked him for his resume so they could undergo a job search of the local community area. And that culminated in a job offer in September of 2004 of a lower level position, the immigration officer position, because that was, and it's undisputed in the record, that that was the only position for which he was qualified. And so I think under the Zuvkovic case, which says that the only thing that's required is an offer of a reasonable accommodation as opposed to the particular accommodation that the employee might seek, that in and of itself is enough to sustain the grant of summary judgment for the employer. However, the employer, I think, went far beyond that here, because the letter that offered him the job also said, if you want us to do more, we'll do it. We'll do a nationwide search if that's what you want. And there was extensive back and forth in which the plaintiff really never made a decision or made a commitment or expressed a willingness to seriously consider reassignment. And I do want to walk through the... Well, maybe I'm getting ahead of your planned presentation, but there's a retaliation claim in here. There is. And he rocked the boat at some point by filing an EEO claim, and shortly thereafter it's just a funny coincidence that he was let go. Well, I think that there's a real causation issue here, because the employer expressed its intent to remove him from the criminal investigator position well before he filed the EEO complaint. As a matter of fact, that expression was the subject of his EEO complaint. They sent him letters in April and May saying, first, provide us with additional medical documentation, because we're concerned about your ability to remain in your position. And then in May, when it became clear that the doctor wasn't going to be able to give any kind of assurance as to a short-term recovery or any kind of a recovery that would enable Mr. Politasi to deal with criminal suspects, at that point they started the process of reassignment. And all that occurred before the EEO complaint or before certainly the plaintiffs. I'm sorry, the managers were aware of the EEO complaint. They weren't interviewed until July on the filing of the EEO complaint. So I think the train, sort of the reassignment train had already left the station before the managers knew of the EEO complaint, so it couldn't be the cause. Mr. Helper, circling back to the end or the middle of whatever, your answer to Judge Ikuda, Ms. Barney puts a lot of weight on the fact that the Crawford reassignment was at a lesser GS level and a lesser salary. What's your response? Well, I think that there's sort of a three-step process that the employer needs to go through. First, they have to see, is there a way of keeping this guy in his current job? The agency did that. Second, is there a job that you can assign him to that's comparable, where he gets close to the same pay, close to the same responsibility? They did that too. They did the job search. They found that the only job for which he was qualified was the lower-level position. And so at that point, I think that the authority that counsel refers to goes to the second step, trying to find a comparable job at comparable pay. There's no authority that says if the best you can do, the most reasonable job you can find, is a job that really isn't comparable because the pay is lower, that you have to make it comparable by raising the pay. I think it's reasonable at that point to go ahead and offer him the job at the highest, the GS-Step 10 level. They did offer it to him at the highest possible level for that job. So I think that the authority is an opposite that has been cited. And I want to go back briefly to this, or maybe more than briefly, to the timeline to show the steps that the agency took to go farther than what was required, than I think was required by the law, in offering to do a nationwide search.  And Mr. Pultasi, at one point in late September, said he was interested in a search in a further geographic area, but he never said where. And so Mr. Bratt, his supervisor, immediately put together a checklist listing all the jurisdictions in the country where I sent offices and said, check off where you're willing to go. And also we want to know for sure what is your position on the immigration officer position. You've never really decided on that. And they did tell him, by the way, that they were not going to give him retained pay. It's inaccurate to say that they never responded to that. You know, I had some questions just looking through the record about how interactive does the interactive process have to be. And I think Mr. Pultasi points out, and there's certainly some evidence in the record, that the employer says, no, we're not going to go any further. We're not really interested in talking to you or meeting with you. And I have a letter here dated October 1, 2004, where it says, Mr. Pultasi, it is imperative that you understand that this ADA reassignment accommodation effort is not an ongoing process. So there certainly was some language and documents in the record indicating some impatience on the part of the employer and saying we will not discuss with you what you really want, which is to try and stay at a similar job and now just pay. What does the case law say about the EEOC guidelines on how interactive the process needs to be? Well, I think it's a very fact-specific inquiry here. So, I mean, I think the language is very broad. Both parties have to conduct themselves reasonably. Both parties have to continue to try and resolve things. I think that that October 1 letter is just really the start of the process. And I think that it's reasonable to say it's not an ongoing process. What they mean is it's not an endless, open-ended process, because they did continue for another month to try to get Mr. Pultasi to focus on reassignment as opposed to staying in his current job. I think that the essential functions analysis that if this court determines somehow that interacting with a dangerous suspect was not an essential function of the job, then we lose at that level and all the other stuff becomes, I think, irrelevant. But if the court determines that the agency was right in determining that there's no way it could keep him in the criminal investigator job or that it was not required to keep him in that job, then appropriately the analysis shifts to reassignment. And did the agency conduct itself reasonably? Was there a breakdown in the interactive process? And if so, who was responsible for the breakdown? And I think you have to look at the record carefully on this because it is a fact-specific inquiry. But at the end, I think it's clear that the plaintiff was responsible for any breakdown in the interactive process. And I think if you look at the correspondence following October 1, where they're trying to get Mr. Pultasi to focus on reassignment, he declines to do it, essentially. And his attorney declines to do it. If you look at the letters that go back and forth, the attorney offers to sit down and conduct an interactive process only on the issue, on reasonable accommodations that will allow Mr. Pultasi to stay as a criminal investigator. So they're still focusing on staying in that job. And so there's letter after letter, back and forth, saying, do you want this immigration officer job? No response. Do you want to conduct a further search anyplace in the country? No response. And I think the most telling – and so the agency gets increasingly urgent in asking Mr. Pultasi to focus on the issue at hand, and he doesn't. And even after they say, look, on an October 12 letter, give us an answer or we're going to propose your termination. And the response is another letter from the attorney saying, that's – you're retaliating, you're harassing. The very proposal of the lower-level job is an act of harassment, an illegal act in itself. And more letters from the doctor saying that the doctor thinks he can do – Mr. Pultasi can do the essential functions. But was there an offer for anything other than the lower-level job at the lower pay with no retained pay? Or you would search someplace outside of Hawaii? Was there any other offer? Those are the two things. Yes. And that was it? Yes. And Mr. Pultasi never really made a decision on either of them. The most telling example is on October 25th, the agency did go ahead and propose his termination, but gave him one more chance to say, look, whatever you've got, whatever you want to propose, we'll listen to it. And if you look at that October 25th letter, it's very open-ended in terms of asking for any kind of reasonable accommodation he wants to propose. The response is a November 3rd letter from the attorney, again saying the only thing we're willing to consider is accommodation in his current job. And the letter actually quotes the EEO regulation that lists possible reasonable accommodations, and it goes through the list. And then when the regulation lists reassignment, there's an ellipse. She's edited out the word reassignment, a clear signal that he's simply not willing to consider reassignment. And I think that's directly analogous, the entire course of events is essentially the same as the employee in the Allen v. Pacific Bell case, in which the employee just refused to show up for a test to see if he could do another job. Here he refused to return a form for offering him another job search, and he refused to even engage in a discussion of the possibility of reassignment. There's another burden that I think the plaintiff bears, and another grounds for affirming the district court in addition to the breakdown in the interactive process, and that's ultimately after discovery, where the plaintiff has the opportunity to review what jobs are open, in the reassignment context, the plaintiff has to identify a job that was vacant that he was capable of filling within the agency. And there's nothing in the record to suggest that there was an open job in the early fall period, when the reassignment was being discussed, September, October, November of 03, that Mr. Pulatase was willing to consider that he was qualified for. So that's another grounds for affirming the district court. One other issue regarding the cases that the plaintiff has cited, and this is back to the essential functions inquiry, there's a lot that the cases that the plaintiff has cited have to do with law enforcement availability pay. And there's a lot of litigation in which people in sort of close to law enforcement jobs want to be treated as law enforcement because you get more money and you get better retirement. So they sue, and then the district court or the court of federal claims decides whether or not their jobs are close enough to law enforcement jobs to qualify for this pay. Well there's no question in this case that the criminal investigator job came with law enforcement availability pay. It's referred to in the complaints that Mr. Pulatase said at one point that he was wrongly denied that pay. And as it developed through proceedings and it was ultimately undisputed that in fact his law enforcement availability pay was never cut off. So he clearly was designated in a category designated by Congress as receiving that pay, which in turn has all kinds of definitions and requirements for dealing with dangerous suspects, for being active, for having to run, jump, use a firearm. And we've quoted that in our brief. Unless the court answers the questions. I don't think so. Ms. Borbee, Mr. Helper has willed you a few extra seconds. Thank you very much. I'd like to respond to a couple of the questions that were raised of Mr. Helper. And one is the issue of when does the interactive process stop or start or how long does it go and what does it entail? And I just cite to Vincent v. Thomas, which is a Ninth Circuit case. It's in my reply brief. As well as Hendricks-Robinson v. Excel Court, which is a Seventh Circuit case, but it's in my reply brief as well. And like v. Hawaiian Airlines, that's also cited in my reply brief. But basically, with respect to the issues in this particular case, the factual issue is that when Mr. Pulatase was given this IIO position, which was not within ICE agency, that he did respond right away. And you have the record on appeal, which shows his response. He doesn't ignore them. He responds right away and he says, well, how about the anti-fraud position? And he gave a copy of the anti-fraud position, which was coming up for vacancy in 2004, to his supervisor, Mr. Bratt. And it didn't require the use of a firearm. Anti-fraud is the use of computers and looking at bank records to see if there's any fraud going on with immigration consequences. So it doesn't require to jump over a fence or run. No response by the employer. And in fact, Mr. Helper did not even mention that. Fortunately for Mr. Pulatase, who didn't have a lawyer at the time, it's all in his memos, memorandums, and it's in his writings. So when the government says that Mr. Pulatase didn't respond, didn't come up with vacant positions, that's shown differently when you look at the records and the actual response of Mr. Pulatase. He's really not living on borrowed time, so he could wrap it up. Just briefly about a reference made to the attorney's letter. When Mr. Pulatase didn't get a response from the agency, he did what most people would do, which is get a lawyer. A lawyer wrote letters not saying, we reject anything that you have to offer us, but to say, let's sit down, let's have a powwow, let's have a meeting, and discuss various alternatives. Thank you. Thank you, counsel. Both of you, the matter just argued will be submitted and the court will stand in recess for the day.
judges: Goodwin, Rymer, Ikuta